**September 23, 2019**

# In the Court of Appeals of Georgia

A19A1603.  CHATHAM  AREA  TRANSIT  AUTHORITY  v. BRANTLEY et al.
A19A1604. CITY OF SAVANNAH v. BRANTLEY et al.
A19A1673. CITY OF SAVANNAH v. POTTS.
A19A1716. CITY OF SAVANNAH v. DUNCAN et al.
A19A1748. CITY OF SAVANNAH v. ADAMS et al.
A19A1774. CITY OF SAVANNAH v. REDLUS et al.
A19A1775. CITY OF SAVANNAH v. GREENE.
A19A1776. CITY OF SAVANNAH v. SENN.
A19A1777. CITY OF SAVANNAH v. BATTISTA.
A19A1778. CITY OF SAVANNAH v. MURPHY.
A19A1779. CITY OF SAVANNAH v. O'NEILL.
A19A1780. CITY OF SAVANNAH v. BRAR et al.
A19A1781. CITY OF SAVANNAH v. DAVIS.
A19A1782. CITY OF SAVANNAH v. FELTES.
A19A1783. CITY OF SAVANNAH v. WOODBY.
A19A1784. CITY OF SAVANNAH v. OWEN.
A19A1785. CITY OF SAVANNAH v. OWEN.
A19A1786. CITY OF SAVANNAH v. GRAY.
A19A1787. CITY OF SAVANNAH v. MOLDRIK.
A19A1788. CITY OF SAVANNAH v. AYOUB et al.

BROWN, Judge.

A group of individuals ("Plaintiffs") filed multiple lawsuits against the Mayor and Alderman of the City of Savannah ("the City") and the Chatham Area Transit Authority ("CAT") after suffering injuries when a dock ramp owned by the City collapsed. The City moved for summary judgment in all cases, contending that the Plaintiffs' claims were barred by sovereign immunity and immunity under the Recreational Property Act (RPA). CAT then also moved for summary judgment under the RPA in all cases. The trial court denied the City's and CAT's motions, and the City now appeals in all of the related cases. CAT appeals in only one case, A19A1603.[1] We consolidated all of the related cases in this appeal. For the reasons set forth below, we affirm in A19A1603 and reverse in all other cases.

On appeal from the grant or denial of a motion for summary judgment, the court applies "a de novo standard of review, viewing the evidence, including any reasonable conclusions and inferences that it supports in the light most favorable to the non-movant." (Citation and punctuation omitted.) *Henderson v. St. Paul Baptist Church*, 328 Ga. App. 123 (761 SE2d 533) (2014). To prevail on a motion for

---

[1] While the trial court entered identical orders denying CAT's motion in each of the cases, CAT apparently has chosen not to appeal the denial in the remaining cases.

summary judgment, the moving party must "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." OCGA § 9-11-56 (c).

So viewed, the record shows that CAT owns and maintains the Savannah Belles Ferry ("the Ferry"), which operates between the Rousakis Riverfront Plaza on River Street and the Savannah International Trade & Convention Center ("the Convention Center"). CAT's entire ferry system operates free of charge to the public. In July 2016, CAT temporarily relocated its Ferry operations on the Savannah River to the dock at issue, which is located on the Savannah River Street Waterfront Plaza. CAT started using this dock as the point at which passengers embarked and disembarked from the Ferry. The entire dock consists of a platform affixed to the bulkhead wall[2] of the Riverfront Plaza. Two ramps, or gangways, connect to this platform and lead down to two floating docks. One floating dock is available to the public, while the other is exclusively used by emergency services vessels. According to the City's Code of Ordinances, the purpose of the dock is to benefit the public, providing City citizens and visitors the convenience of accessing, enjoying, and

---

[2] The current version of Merriam-Webster defines "bulkhead" as "a retaining wall along a waterfront."

3

viewing historic scenic sites in the City. Additionally, members of the public may moor their boats to the dock free of charge for the first three hours, after which they must pay a fee.

On November 19, 2016, the Convention Center was holding a Christmas convention. A group of people, including Plaintiffs, were standing on the ramp connected to the floating dock, waiting to board the Ferry. At some point, the ramp disengaged from the bulkhead and collapsed. Plaintiffs sustained various injuries in connection with the ramp's collapse and subsequently instituted personal injury actions against the City and CAT,[3] alleging negligence and gross negligence in the maintenance of the dock[4] and operation of the ferry.[5]

On February 13, 2018, the City moved for summary judgment in each of the cases on immunity grounds. CAT initially opposed the City's motion, but later filed

---

[3] One Plaintiff, Andrew Davis, suffered injuries after leaping from River Street to the concrete pad below in an attempt to aid the victims of the ramp collapse.

[4] Throughout this opinion, we use the phrase "the dock" to refer to the entire structure, including the platform, ramps, and floating docks.

[5] Plaintiffs Brar, Akhavan, Brantley, Wilson, and Davis also asserted claims for punitive damages against both the City and CAT. Brar, Akhavan, and Davis withdrew their punitive damages claims against the City, but not CAT. As far as this Court can determine from the record, Brantley and Wilson's punitive damages claims against both the City and CAT remain.

4

its own motion for summary judgment in each of the cases, arguing it too was entitled to immunity under the RPA. The only evidence the parties presented for the trial court's consideration was in the form of affidavits with attached exhibits. The trial court denied the City's motions on May 7, 2018, and issued an identical order in each of the cases consolidated in this appeal. The trial court also denied CAT's motion for summary judgment in each of the cases. The City filed applications for interlocutory review of the trial court's denials of its motions for summary judgment in all cases. CAT filed an application for interlocutory review in only one case. We granted the applications and, as stated above, consolidated all of the related cases in this appeal.

*The City*

1. *Sovereign Immunity.* In two related enumerations of error, the City asserts that the trial court erred in denying its motion for summary judgment because the City is shielded from liability by sovereign immunity.

> Sovereign immunity is a threshold issue that the trial court is required to address before reaching the merits of any other argument. It is axiomatic that the party seeking to benefit from the waiver of sovereign immunity bears the burden of proving such waiver. Whether sovereign immunity has been waived under the undisputed facts of this case is a question of law, and this Court's review is de novo.

5

(Citations and punctuation omitted.) *Fulton County v. SOCO Contracting Co.*, 343 Ga. App. 889, 893 (1) (808 SE2d 891) (2017). Under the Georgia Constitution, municipalities are protected by sovereign immunity unless the General Assembly waives it. Ga. Const. of 1983, Art. IX, Sec. II, Par. IX. This principle is reiterated in OCGA § 36-33-1, which pertinently provides that "it is the public policy of the State of Georgia that there is no waiver of the sovereign immunity of municipal corporations of the state and such municipal corporations shall be immune from liability for damages." OCGA § 36-33-1 (a). However, subsection (b) of this same statute provides a narrow waiver of a municipality's sovereign immunity "[f]or neglect to perform or improper or unskillful performance of [the municipal corporation's] ministerial duties." OCGA § 36-33-1 (b). This provision has been consistently interpreted "to mean that municipal corporations are immune from liability for acts taken in performance of a governmental function but may be liable for the negligent performance of their ministerial duties." (Citations omitted.) *City of Atlanta v. Mitcham*, 296 Ga. 576, 577-578 (1) (769 SE2d 320) (2015).

One such ministerial duty long recognized by the courts of this State "is the duty of a municipality to maintain city streets in a reasonably safe condition for travel." (Citations omitted.) *City of Savannah v. Herrera*, 343 Ga. App. 424, 428 (1)

6

(808 SE2d 416) (2017). A municipality's duty in this regard is delineated by OCGA § 32-4-93 (a):

> A municipality is relieved of any and all liability resulting from or occasioned by defects in the public roads of its municipal street system when it has not been negligent in constructing or maintaining the same or when it has no actual notice thereof or when such defect has not existed for a sufficient length of time for notice thereof to be inferred.

Id. Stated differently, "municipalities generally have a ministerial duty to keep their streets in repair, and they are liable for injuries resulting from defects after actual notice, or after the defect has existed for a sufficient length of time for notice to be inferred." (Citation and punctuation omitted.) *Roquemore v. City of Forsyth*, 274 Ga. App. 420, 423 (617 SE2d 644) (2005). The City argues that the trial court erred in applying this statutory waiver to the case at hand. Specifically, the City argues that the dock is not a "public road[ ] of its municipal street system," such that the City's ministerial duty to maintain its streets under OCGA § 32-4-93 (a) is implicated. We disagree.

Section 3 of Chapter 1 defines "public road" for the purposes of Title 32 and includes a non-exhaustive list of examples:

a highway, road, street, avenue, toll road, tollway, drive, detour, or other way that either is open to the public or has been acquired as right of way, and is intended to be used for enjoyment by the public and for the passage of vehicles in any county or municipality of Georgia, *including but not limited to the following public rights, structures, sidewalks, facilities, and appurtenances incidental to the construction, maintenance, and enjoyment of such rights of way*:

> (A) Surface, shoulders, and sides;
> (B) Bridges;
> (C) Causeways;
> (D) Viaducts;
> *(E) Ferries*;
> . . .
> (M) Parking facilities;
> (O) Canals and culverts;
> (P) Rest areas;
> . . . .

(Emphasis supplied.) OCGA § 32-1-3 (24). In its orders, the trial court concluded that the dock qualified as a "public road" because a ferry is expressly included in the statutory definition and a dock is necessary for the use and enjoyment of a ferry. The City contends that the trial court overlooked the phrase "municipal street system" in OCGA § 32-4-93 (a), which further limits a municipality's duty under the statute; namely, that a municipality only has a duty to maintain those public roads which are part of its municipal street system. In furtherance of this argument, the City cites

8

*Herrera*, supra, "[a]s particularly instructive on what should and what should not be considered a part of the 'municipal street system'. . . ." (Emphasis omitted.)

In *Herrera*, this Court addressed "what constitutes a defect in the public roads under OCGA § 32-4-93 (a), and in particular, whether objects adjacent to the road that obstruct the view of travelers on the road are considered 'defects in the public roads.'" 343 Ga. App. at 428-429 (1). After pointing out that defects for which a municipality may be liable "have been held to include objects adjacent to, and suspended over, the municipality's streets," we concluded that a jury must determine whether a tree located on the municipality's right of way obstructed the view of oncoming traffic such that it was a defect within the meaning of OCGA § 32-4-93. *Herrera*, 343 Ga. App. at 429-430 (1). The City interprets this to mean that the dock cannot be part of the municipal street system because "[t]here is no evidence in the record that [it] is adjacent to or suspended over a municipal street." (Punctuation omitted.) However, at no point in *Herrera* did we discuss the phrase "municipal street system" or its meaning. Our conclusion in that case, as it clearly states, merely addresses what may be considered a defect based on its location in relation to the public road not whether the public road is part of the municipal street system.

9

While we agree that OCGA § 32-4-93 (a) contains this language for a reason, we disagree with the City's proffered reason. We conclude that the phrase "municipal street system" was instead included to limit the municipality's duty to only those public roads within the municipality's control as opposed to public roads controlled or maintained by the county or State. This construction is supported by Title 32's classification of Georgia's public roads into three systems: (1) a state highway system; (2) county road systems; and (3) municipal street systems. See OCGA § 32-4-1. See also *Dept. of Transp. v. Carr*, 254 Ga. App. 781, 783 (1) (564 SE2d 14) (2002). This Code section explains that "[e]ach municipal street system shall consist of those public roads within the limits of that municipality which are not in any other classification under this Code section." OCGA § 32-4-1 (3). Reading this language in conjunction with OCGA § 32-4-93 (a) leads to the conclusion that a municipality has a ministerial duty to maintain those public roads within its limits which are not part of a state highway system or county road system.

With this in mind, we return to the question at hand: whether the City-owned dock is a public road within the municipal street system by virtue of its use in conjunction with the Ferry. It is undisputed that the Ferry is owned and operated by CAT, an agency unaffiliated with the City. Thus, while "ferry" is expressly included

10

in the statutory definition of "public road," the Ferry would not qualify as a public road *in the City's municipal street system*. See OCGA §§ 32-1-3 (24), 32-4-93 (a). It follows that the dock's status as a structure or appurtenance incidental to the maintenance and enjoyment of the Ferry does not bring it within the definition of a public road in the City's municipal street system.[6]

However, this does not mean that the dock cannot qualify as a public road of the municipal street system in its own regard. OCGA § 32-1-3's definition of "[p]ublic roads" expressly includes "other ways." While Title 32 does not define "way," it is generally defined as "[a] passage or path." Black's Law Dictionary (11th ed., 2019). And a "passage" is "[a] right, privilege, or permission to cross land or water; an easement to travel through another's property." Id. Here, the City owns the dock, but gives the public permission to use the dock, including the ramp, in order to cross from River Street to the river. We thus conclude that the dock, as a "way" which

---

[6] Plaintiffs contend that the Ferry and the dock are part of the "municipal street system" by virtue of the fact that they are part of the City's public transportation system, but there is no evidence in the records supporting this contention. In fact, the only evidence in the record shows that the Ferry is in fact part of CAT's public transportation system, not the City's.

11

is intended for public use and for the passage of vehicles,[7] falls within the expansive definition of public road found in OCGA § 32-1-3. And because it is owned and operated by the City, it is a public road of the City's municipal street system. Accordingly, the trial court did not err in finding that the City has a ministerial duty to maintain the dock in a reasonably safe condition under OCGA § 32-4-93 (a).

This conclusion does not end our analysis, however, because the City may only be held liable if it had notice of the alleged defect, or if the defect existed for a length of time sufficient to place the City on constructive notice.[8] See *Herrera*, 343 Ga. App. at 431; *Thompson v. City of Atlanta*, 274 Ga. App. 1, 2-3 (1) (616 SE2d 219) (2005).

> Constructive notice of a defect may be imputed through the knowledge of the city's employees or agents, or may be shown by testimony as to how long the defect existed prior to the injury, objective evidence that the defect existed over time, or evidence that others were injured as a result of the same condition over a period of years. The question of

---

[7] Title 32 defines a "[v]ehicle" as "a device in, upon, or by which any person or property is or may be transported or drawn upon a public road," which seemingly would include things such as bicycles. OCGA § 32-1-3 (31). Evidence in the record shows that the Ferry transported bicycles, wheelchairs, and strollers.

[8] "This Court has held that the term 'defects' covered by this Code section includes defects brought about by the forces of nature and by persons and which render the street unsafe and includes objects adjacent to and suspended over the street." (Citation and punctuation omitted.) *Roquemore*, 274 Ga. App. at 423.

12

constructive notice ordinarily is for the jury, except in the absence of any evidence of constructive notice that could create a fact question.

(Citation and punctuation omitted.) *City of Macon v. Brown*, 343 Ga. App. 262, 264-265 (807 SE2d 34) (2017).

A Senior Civil Engineer for the City averred that in October 2016, he "personally visited, observed and inspected the City's dock," but "did not observe anything that caused [him] to believe that the platform and ramp leading to the [dock] were in an unsafe condition or at risk of becoming detached. . . ." He additionally averred that the City retained a marine contracting company to survey the dock after Hurricane Matthew and that inspection "revealed nothing to indicate that the platform or gangway were in an unsafe condition." Thus, the City put forth evidence that it inspected the dock on two separate occasions after Hurricane Matthew, but before the incident, and neither inspection revealed any damage that led the inspectors to believe that the dock was in an unsafe condition.

In response and in support of their claim of notice, Plaintiffs put forth a report issued by the City on October 14, 2016, allegedly required by the Federal Emergency

13

Management Agency (FEMA).[9] The report refers to the "Docks on River St." and concludes that "[t]he whalers (wood members), the cleats, and the rails appear to be damaged," and that the condition of the docks' utility pedestals and conditions are unknown. The report includes a photograph of a dock, but the photograph is unclear, and we are unable to ascertain whether this is the dock at issue. In addition to the FEMA report, Plaintiffs offered an affidavit from a retained consulting engineer. The engineer averred that

> the damage that caused the collapse would easily have been discovered had a proper inspection been completed, . . . the defects that caused the collapse would have been present for a substantial period of time, . . . [and] the docks should have been closed until a full investigation and required repairs were completed.

These observations were based on the expert's review of the FEMA report and "photographs of the dock that were taken as part of the FEMA Report and . . . after the collapse." As an initial matter, the City argues that this evidence fails to identify any specific defect with the ramp. We agree.

---

[9] Nothing in the record shows who authored the report or that it was in fact required by FEMA. Plaintiffs state that the report was produced by the City in response to an open records request, see OCGA § 50-18-70, but have not provided a record citation to the request. The parties refer to the report as "the FEMA report" throughout their pleadings and briefs, and we do the same.

We first note that it is not readily apparent whether the damage mentioned in the FEMA report referred to the ramp rather than the floating dock, which did not fail. Additionally, the report references "Docks on River St.," but it is unclear whether there are multiple docks owned by the City on River Street and this refers to all of them, some of them, or whether this simply refers to the dock at issue. In his affidavit, Plaintiffs' expert does not identify what alleged defect caused the ramp to collapse, if any, nor does he identify what damage noted in the FEMA report caused, or could have caused, the ramp to collapse. In fact, nothing in the record identifies the defect of which the City was supposed to have notice.[10] The expert affidavit's conclusory statement that the unidentified defect had existed for a "substantial period of time"

[10] Plaintiffs point to a "NOTE" included at the top of each page of the FEMA report as evidence that the City had constructive notice of the unidentified defect. The note states:

> The costs included in this report are based on a limited assessment and are for preliminary budget purposes only. Total extent of damage is unknown. The list does not include all City facilities and some required repairs are concealed and have not yet been evaluated.

To the extent Plaintiffs argue that we should attribute notice to the City because it failed to perform a more thorough inspection of the dock based on this note, we decline. Again, at the time this report was issued, two separate inspections of the dock had not revealed any damage leading the City to believe the dock was in an unsafe condition. Reading the note in its entirety, it is clear that it is a boilerplate disclaimer as to the cost of the repairs.

15

fails to amount to even the slight evidence required to satisfy Plaintiffs' burden of production on a motion for summary judgment.[11] See *City of St. Marys v. Reed*, 346 Ga. App. 508, 510 (816 SE2d 471) (2018) ("without context or explanation, any conclusion as to the age of the alleged defect . . . would be mere speculation"); *D & H Const. Co. v. City of Woodstock*, 284 Ga. App. 314, 317 (1) (643 SE2d 826) (2007) (affidavits containing nothing but vague assertions of fact and conclusory statements unsupported by factual evidence insufficient to avert summary judgment). Accordingly, the trial court erred in denying the City's motion for summary judgment on the basis of sovereign immunity.

---

[11] Plaintiffs' reliance on *Clark v. City of Atlanta*, 322 Ga. App. 151 (744 SE2d 122) (2013), is misplaced. In that case, the plaintiff submitted photographs taken of the sidewalk on which she fell. *Clark*, 322 Ga. App. at 153. The photographs were taken one to two years before her fall and two months after the incident. Id. The plaintiff argued that the photographs showed that the uneven sidewalk had been in a defective state for at least seven months, and the plaintiff's expert identified a specific depression in the pavement which he averred was visible in a photograph taken of the sidewalk one year before the plaintiff's fall. Id. This Court held that this evidence was sufficient to satisfy the plaintiff's burden of production. Id. at 153-154. Here, in contrast, no time period was identified by Plaintiffs' expert as to the duration of the unidentified defect. And unlike in *Clark*, the expert's opinion here is not based on identified, objective evidence such as photographs of a defect taken over a period of time.

16

2. *Other Defenses.* Because we have found that the City is entitled to sovereign immunity, we need not address the City's remaining enumerations of error that it is entitled to immunity under the RPA and that punitive damages claims against it are improper. See *Ratliff v. McDonald*, 326 Ga. App. 306, 311 (1) (756 SE2d 569) (2014).

*CAT*

3. *Immunity under the RPA.* In two related enumerations of error, CAT argues that the trial court erred in denying its motion for summary judgment because it is entitled to immunity under the RPA. We disagree.

Under the RPA, "an owner of land owes no duty of care to keep the premises safe for entry or use . . . or to give any warning of a dangerous condition, use, structure, or activity on the premises to persons entering for recreational purposes." OCGA § 51-3-22. Further, "an owner of land who either directly or indirectly invites or permits without charge any person to use the property for recreational purposes" is shielded from liability. OCGA § 51-3-23. See also *Mercer Univ. v. Stofer*, __ Ga. __, 2019 WL 2571003 at *1 (S18G1022, decided June 24, 2019). "Recreational purpose[s]" include, but are not limited to, "hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, aviation activities, nature study, water

17

skiing, winter sports, and viewing or enjoying historical, archeological, scenic, or scientific sites." OCGA § 51-3-21. The stated purpose of the RPA "is to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting the owners' liability towards persons entering thereon for recreational purposes." OCGA § 51-3-20. See also *City of Garden City v. Harris*, 302 Ga. 853, 856 (809 SE2d 806) (2018). Our appellate courts have interpreted the RPA very broadly, finding that it "encompasses any recreational activity, i.e., any amusement, play or other form of relaxation which refreshes the mind or body." *Anderson v. Atlanta Committee for the Olympic Games*, 273 Ga. 113, 115 (537 SE2d 345) (2000). See also *City of Chickamauga v. Hentz*, 300 Ga. App. 249, 251 (684 SE2d 372) (2009). In denying CAT's motion for summary judgment, the trial court concluded that a question of fact existed as to whether the purpose of the dock was recreational in nature.

(a) A party seeking to benefit from the immunity provided by the RPA must be an "owner," defined in OCGA § 51-3-21 (3) as "the possessor of a fee interest, a tenant, a lessee, an occupant, or a person in control of the premises." It is undisputed that CAT does not own the dock. Nor does CAT argue that it was a tenant or lessee. Instead, CAT asserts that it is an "owner" of the dock under the RPA because it

18

occupied the dock on numerous occasions the day of the accident because the Ferry docked there. CAT alternatively argues that it is an "owner" of the dock because it was in control of the premises when the Ferry tied up to the dock to the exclusion of other vessels and because it had to exert control over the premises to make sure that it was safely discharging and loading passengers. The record, however, contains no evidence showing that the Ferry was docked at the time of the ramp collapse[12] or that a CAT employee was working at the ramp or dock when it collapsed. Nor does CAT assert that it had an exclusive right to occupy the dock on the day of the collapse.

There is an absence of case law discussing the meaning of "occupant" or the phrase, "in control of the premises," as these pertain to the RPA. In only one case that this Court can find has the issue of a "non-owner's" liability been addressed. See *Martin v. Dempsey Funeral Svcs. of Ga.*, 319 Ga. App. 343, 344 (735 SE2d 59) (2012), disapproved on other grounds, *Stofer*, __ Ga. __. In *Martin*, the plaintiff sustained injuries after falling in a cemetery. Id. at 344. She brought suit against the LLC that owned the cemetery as well as a subsidiary of the LLC owner, which was responsible for the maintenance and general groundskeeping of the cemetery. Id. at

---

[12] Plaintiffs' unverified complaints allege that at the time of the collapse, the Ferry had departed from the dock.

19

344-345. This Court concluded that a question of fact existed as to whether the subsidiary was an "owner" under the RPA. Id. at 348 (2). We noted that liability against the subsidiary "could be imposed based upon theories that it acted as [the LLC's] agent and exercised control of the premises to the extent of its provision of care and maintenance." Id.

While the City had given CAT permission to temporarily use its dock while CAT's usual dock underwent repairs,[13] it also allowed all members of the public to moor their vessels to the dock. It is undisputed that CAT did not pay the City for the use of the dock. And nothing in the record reflects that CAT maintained the dock or performed any upkeep such that it exercised control over the premises like the subsidiary in *Martin*. Accordingly, the outcome of this case is not governed by our analysis in *Martin*.

As we have already stated, an "owner" under the RPA is "the possessor of a fee interest, a tenant, a lessee, an occupant, or a person in control of the premises." OCGA § 51-3-21 (3). Black's Law Dictionary defines "occupant" as "[s]omeone who has possessory rights in, or control over, certain property or premises," or "[s]omeone

---

[13] According to the affidavit of CAT's operations manager, no written agreement or document reflecting CAT's use of the dock exists.

who acquires title by occupancy." Black's Law Dictionary (11th ed. 2019). However, "occupant" is also commonly understood to mean "one who occupies a particular place." Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/occupant. And to "occupy" can mean, among other things, "to take up (a place or extent in space)." Merriam-Webster's Online Dictionary, http://www.merriam-webster/dictionary/occupy.

"The legal maxim 'noscitur a sociis' means generally that a word or phrase may be known from its accompanying terms." (Citation omitted.) *Franklin v. Pitts*, 349 Ga. App. 544, 553 (1) (d) (826 SE2d 427) (2019). Under this canon, "words . . . should be understood in relation to each other, since words, like people, are judged by the company they keep." (Citation and punctuation omitted.) *Warren v. State*, 294 Ga. 589, 590-591 (1) (755 SE2d 171) (2014). Accordingly, the term "occupant" should be gauged by the words surrounding it. The term appears in a list defining owner as "the possessor of a fee interest, a tenant, a lessee, an occupant, or a person in control of the premises." OCGA § 51-3-21 (3). This listing suggests some type of legally recognizable interest in the property as opposed to the physical sense of the word — i.e., taking up space. Here, nothing in the record establishes that CAT has a legally recognizable interest in, possessory rights in, or control over the dock. And

21

even if we were to construe the term "occupant" in the RPA's definition of "owner" as encompassing someone who physically occupies or takes up space, there is no evidence in the record showing that the Ferry was tied to the dock at the time of the collapse.

We therefore conclude that CAT is not an "owner" of the premises and thus is not entitled to immunity under the RPA. While the trial court decided CAT's motion for summary judgment based on the issue of "recreational purposes," it did not err in denying the motion, and we therefore affirm. See *Peachstate Developers, LLC v. Greyfield Resources*, 284 Ga. App. 501, 505 (2) (644 SE2d 324) (2007) ("The grant or denial of summary judgment will be affirmed if it is right for any reason.").

(b) Based on our holding in Division 3 (a), supra, we need not address whether the other statutory conditions for immunity under the RPA were met in this case.

*Judgment affirmed in Case No. A19A1603. Judgments reversed in Case Nos. A19A1604, A19A1673, A19A1716, A19A1748, A19A1774, A19A1775, A19A1776, A19A1777, A19A1778, A19A1779, A19A1780, A19A1781, A19A1782, A19A1783, A19A1784, A19A1785, A19A1786, A19A1787, A19A1788. Barnes, P. J., and Mercier, J., concur*.

22